UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 2:12-cr-00016-wks |
| | : | |
| BRUCE WAYNE LAMELL | : | |

**MEMORANDUM OPINION AND ORDER**

Defendant Bruce Lamell is charged with knowing possession of a firearm as a convicted felon under 18 U.S.C. § 922(g)(1), and knowing possession of stolen firearms under 18 U.S.C. § 922(j). Lamell moved to suppress evidence and statements obtained by law enforcement officers on July 3, 2012. For the reasons set forth below, the Court **DENIES** the motion to suppress.

**I. FACTS**

On October 29, 2011, R&L Archery, a Barre, Vermont firearms dealer, was burglarized. Several pistols and a Taser were stolen. Later that day, a confidential informant ("informant") contacted Corporal Tucker, an officer with the Barre Police Department. The informant told him that a person in Barre identifying himself as "Chip" had contacted him about selling a handgun. In an attempt to determine "Chip's" true identity, Corporal Tucker contacted Al George, an officer with the Department of Correction's ("DOC") Field Supervision Unit.

1

George believed that "Chip" was Bruce Lamell, a furloughed inmate. George informed his superintendent of his suspicions. His supervisor instructed George to conduct a search of Lamell's residence, as well. While Corporal Tucker urged George to search Lamell's residence, this Court finds that George based his decision to search the residence on his superintendent's instructions.

Later that evening, George went to Lamell's residence to search for alcohol, illegal drugs, and weapons. He was accompanied by DOC Officers Dave Nesbitt and Stephanie Jane and Corporal Tucker and James Pontbriand of the Barre Police Department. Barre Police Officers accompanied the DOC Officers for safety reasons.

Once the officers arrived, George knocked on the door. Lamell's stepson Ryan opened the door, and Lamell soon approached. George explained to Lamell that they would be conducting a search of his home. George did not explain that he suspected that Lamell possessed stolen firearms. Lamell let the officers into his residence. Lamell never expressed an objection to the search.

Lamell's wife Amy was upstairs asleep when the officers entered. After the officers entered the residence, Lamell went upstairs to wake her; the officers waited in the kitchen area. When Mrs. Lamell came downstairs, George requested her consent to

search the residence. She consented to a search.

George, Lamell, Mrs. Lamell, and Lamell's stepson remained in the kitchen while the Officers conducted the search. Corporal Tucker and officer Pontbriand went to the basement while Nesbitt and Jane searched upstairs. Officer Pontbriand found a sales tag of one of the stolen handguns in the basement. Upon discovery of the sales tag, Corporal Tucker went upstairs. He began to search the stepson's bedroom with Officer Nesbitt. There they found a manual for the Taser behind the bed's headboard; officers found one of the stolen pistols underneath the mattress. The markings on the pistol matched the markings on the sales tag found in the basement.

Corporal Tucker carried the handgun to the kitchen, where he showed the weapon to George. Corporal Tucker did not direct any questions to Lamell. Upon seeing the weapon, Lamell's stepson stated that he had found the gun a few days prior at his grandmother's house. Lamell responded that he did not know how the gun came to be in his residence.

Officers put Lamell in handcuffs and transported him to the Barre City Police Department. Officer Pontbriand remained at the residence. The officers did not ask Lamell any questions on the way to the Police Department, and George informed Lamell that he could not speak with him. At the station, Lamell was read his <u>Miranda</u> warnings, and he signed the Miranda Warning Form. Lamell

asked to speak with an attorney; all questioning ceased. Sometime later Lamell was transported to the Northeast Regional Facility in St. Johnsbury.  Lamell used the prison's telephones while he was incarcerated.  When he arrived at the facility, a DOC officer informed him that his phone calls would be recorded.  Additionally, before every phone call, a recorded warning reminded Lamell that his call would be recorded.

In the early hours of October 30, the officers returned to the residence.  Mrs. Lamell and her son were still awake when the officers returned.  In the kitchen, Corporal Tucker informed Mrs. Lamell of the situation and explained that there may be more guns in the residence.  During that discussion, Ryan entered the room.  Mrs. Lamell consented to a subsequent search of the residence, and Ryan admitted that he was involved in the burglary. He informed the officers that he believed the remainder of the guns were in the basement.  Corporal Tucker found the guns on a shelf on the left-hand side of the basement.  After Corporal Tucker discovered the remaining firearms, the officers left the Lamell residence.

At approximately 4:00 a.m. Corporal Tucker returned to the residence.  Corporal Tucker read Ryan his <u>Miranda</u> rights, and both Mrs. Lamell and Ryan signed the <u>Miranda</u> form before Ryan confessed involvement in the robbery.

During that search, Officers found the other stolen handguns.

On February 16, 2012, a federal grand jury indicted Lamell with possession of firearms as a convicted felon in violation of 18 U.S.C. § 922(g)(1) and possession of stolen firearms in violation of 18 U.S.C. § 922(j). On July 3, 2012, Defendant filed the motion to suppress now under consideration.

## II. Discussion

Lamell makes several arguments why the physical and testimonial evidence must be suppressed: (1) his status as a furloughed inmate did not justify the warrantless arrest; (2) his wife's consent was ineffective; (3) his statements were taken in violation of <u>Miranda</u>; and (4) the recordings of his phone conversation must be suppressed as a violation of his First and Fourth Amendment rights as well as 18 U.S.C. § 2510 *et. seq*.

### A. Lamell's Status as a Furloughed Inmate

Lamell makes several arguments why his status as a furloughed inmate did not justify the warrantless search. The Court finds none persuasive.

The furlough agreement between Lamell and the State of Vermont authorized Lamell's "assigned Probation Officer or designee to visit [him] in [his] home or place of employment or elsewhere at any time." It further provided that he would "submit [his] person, place of residence, vehicle, or property to a

5

search at any time of the day or night by my assigned Probation Officer or designee."

Lamell first argues that this agreement was invalid because his options were consent or remain in prison. In essence, Lamell contends that the choice between continued incarceration or furlough was not a real choice, and, therefore, his consent was coerced.

The Court disagrees. Lamell's argument equates furlough with something less than imprisonment and ignores that the grant of furlough is discretionary. As furloughed inmates remain under the custody of the State, furlough is the equivalent of detention. Furthermore, the DOC is under no obligation to place inmates on furlough. See VT. STAT. ANN. tit. 28, § 808(a) (2011) ("The department *may* extend the limits of the place of confinement of an offender . . . if the offender agrees to comply with such conditions of release the department in its sole discretion, deems appropriate for that offender's furlough.") (emphasis added). Thus, Lamell's choice was between remaining in his cell or going on furlough. Under such circumstances, this Court cannot conclude that acceptance of certain terms of release rendered his assent involuntary.

Lamell next argues that, even if the agreement was valid, the fruits of the search must be suppressed because the search was not conducted pursuant to the agreement. He claims that the

search was directed by law enforcement officers as part of their criminal investigation.  This Court finds that the search was conducted pursuant to the valid furlough agreement.  George had a duty to make sure that Lamell did not violate any conditions of the furlough agreement.  See United States v. Reyes, 283 F.3d 446, 459 (2d Cir. 2002) (recognizing that parole/probation officers have a duty to investigate and ensure that probationers and parolees do not commit crimes or violate the terms of release).  Furthermore, George proceeded to Lamell's residence on the instruction of his superintendent.  Because this Court concludes that the search was within the scope of George's duties and was conducted under the direction of the DOC, the search was made pursuant to the agreement.

Even if the agreement were in some way invalid, the search would still not have been unreasonable under the Fourth Amendment.  Lamell's status as a furloughed inmate left him with a diminished expectation of privacy.  See United States v. Knights, 534 U.S. 112, 119 (2001); Samson v. California, 547 U.S. 843, 850 (2006).  It is well recognized that the protections of the Fourth Amendment "extend only to unreasonable government intrusions into legitimate expectations of privacy."  United States v. Julius, 610 F.3d 60, 65 (2d Cir. 2010).  As Lamell enjoyed only a limited expectation of privacy as a furloughed inmate, the search did not violate his Fourth Amendment rights.

7

B.  Mrs. Lamell's Consent

1.  First Consent

Even if the furlough agreement did not authorize the search, the Government relies upon Mrs. Lamell's third-party consent as an alternative basis.  Lamell also argues that this Court must suppress the evidence against him because his wife's consent to search the home was involuntary.  In response, the Government contends that Lamell lacks standing to assert Mrs. Lamell's Fourth Amendment rights.

Lamell does not have standing to object to violations of his wife's Fourth Amendment rights.  United States v. Haqq, 278 F.3d 44, 47 (2d Cir. 2002) ("'Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted.'" (quoting Rakas v. Illinois, 439 U.S. 128, 13334 (1978))).  Accordingly, to succeed on a Fourth Amendment claim a defendant must demonstrate that the official conduct "'invaded his legitimate expectation of privacy rather than that of a third party.'"  Haqq, 278 F.3d at 57 (quoting United States v. Payner, 447 U.S. 727, 731 (1980)).

Lamell argues that his wife's consent was coerced.  His argument is a clear attempt to assert a violation of her Fourth Amendment rights.  Because he does not have standing to pursue a violation of Mrs. Lamell's Fourth Amentment rights, the Court may not suppress the evidence on these grounds.

Lamell also argues that the holding in Georgia v. Randolph requires this Court to suppress the evidence. 547 U.S. 103 (2006). In Randolph, a woman and her ex-husband were at the front door together when a police officer asked for consent to search their shared residence. Id. at 107. The woman consented, but her ex-husband expressly refused. Id. In reliance on the ex-wife's consent, the officer went into the home and discovered a drinking straw with a powdery residue that was later revealed to be cocaine. Id. The ex-husband moved to suppress the evidence, arguing that it was the result of a warrantless search and that the search of house was not authorized by his ex-wife's consent over his express refusal. Id. at 107-08.

Under these circumstances, the Court drew what is described as a "fine line." The Court concluded that "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." Id. at 105.

Randolph is clearly distinguishable. Lamell did not, and lacked the capacity to, expressly withhold consent. Lamell lost the ability to withhold consent when he went on furlough. Not only did the furlough agreement authorize the search of his residence at any time by his probation officer or designee, his

9

limited Fourth Amendment protections effectively deprived him of the capacity to withhold consent. Lamell's failure to withhold consent, and lack of authority to refuse the search, clearly distinguishes this matter from Randolph.

Randolph is distinguishable on other grounds, though. The Lamells did not stand at the door together. Rather, when the officers arrived, Amy Lamell was upstairs asleep. She only entered the scene after the officers entered the home. Once Lamell let the officers in, he went upstairs to awaken his wife. She consented to the search and signed the consent form. Thus, unlike Randolph, the Lamells were not at the front door together, disagreeing as to whether to allow a search of the residence. Under these circumstances, the Randolph Court's "fine line" does not apply.

2.  Second Consent

Lamell appears to argue that the evidence procured the day after the initial search must be suppressed both because Amy Lamell's second consent was invalid and because the second search was a fruit of the earlier illegal search. The Government responds that she never revoked her consent to search from the night before and her conduct demonstrated implied consent.

Lamell's first argument fails because, as discussed above, he does not have standing to pursue alleged violations of Mrs. Lamell's Fourth Amendment rights. But even if he did have

standing, no evidence was presented at the hearing to suggest that Ms. Lamell's consent was involuntary.

Lamell also lacks standing to argue that the evidence must be suppressed as a fruit of the poisonous tree. The Court articulated this doctrine in <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963). Under <u>Wong Sun</u>, a party seeking to suppress evidence as a fruit of the poisonous tree must have suffered the initial Fourth Amendment violation that led to the discovery of later lawfully obtained evidence. Because the first search did not violate any of Lamell's Fourth Amendment rights, he cannot assert a fruit of the poisonous tree defense as to the subsequently discovered evidence.

### C. Violation of Miranda

Lamell next argues that his statements in the kitchen following the discovery of the firearm must be suppressed as they were made in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436, 478 (1966). The Government argues in response that Lamell's statements did not violate <u>Miranda</u> because the statements were neither made in response to direct questioning nor the functional equivalent of questioning. For the reasons discussed below, the Court agrees with the Government.

It is settled that <u>Miranda</u> applies to custodial interrogations. <u>United States v. Mitchell</u>, 966 F.2d 92, 98 (2d Cir. 1992); <u>Miranda</u>, 384 U.S. at 444. The "safeguards outlined

in <u>Miranda</u> are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980). Under <u>Miranda</u> "interrogation" "must reflect a measure of compulsion above and beyond that inherent in custody itself." <u>Id.</u> Thus, <u>Miranda</u> "come[s] into play whenever a person in custody is subjected to either express questioning or its functional equivalent." <u>Id.</u> at 300-01. The "functional equivalent" of questioning consists of "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u>

Here, Lamell argues that Officer Tucker reasonably expected to elicit a statement from him when he entered the kitchen with the firearm. This Court cannot conclude that walking into a room with freshly discovered evidence constituted the functional equivalent of questioning. The Officer's statements following the discovery of the weapon were directed at George, not Lamell. In addition, display of a weapon discovered during an otherwise lawful search does not constitute an interrogation. <u>See, e.g.</u>, <u>United States v. McCarty</u>, 475 F.3d 39, 42 (1st Cir. 2007) (concluding defendant's proclamation "'[t]hat's mine'" after officer walked into a room with a firearm did not constitute an interrogation, and, therefore, did not violate <u>Miranda</u>). Because

showing a weapon and statements directed to another law enforcement official are not the functional equivalent of questioning, Lamell's statements following the display of the discovered firearm did not violate <u>Miranda</u>.

### D. Telephone Recordings

#### 1. Title III

Defendant next urges this Court to suppress the telephone recordings under 18 U.S.C. § 2510 *et. seq.* ("the Act"). The Government argues that Lamell consented to the recordings, and, therefore, the consent exception applies.

Generally, the Act prohibits the "interception of wire communication, including telephone conversations, in the absence of authorization by court order." <u>United States v. Willoughby</u>, 800 F.2d 15, 19 (2d Cir. 1988). The Act "clearly applies to prison monitoring. <u>United States v. Amen</u>, 831 F.2d 373, 379 (2d Cir. 1987). Courts may not receive as evidence the contents of recordings taken in violation of the Act. 18 U.S.C. § 2515.

The Act exempts recordings made pursuant to consent by one party. Subsection (2)(c) of section 2511 provides: "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c).

Consent under the Act may be express or implied. Amen, 831 F.2d at 378; see also United States v. Workman, 80 F.3d 688, 693 (2d Cir. 1996); Willoughby, 860 F.2d at 19. After reviewing the legislative history, the Amen court concluded that the inmates had impliedly consented to the recordings because they received notice from several sources before using the telephones. Amen, 831 F.2d at 379.

The parties stipulated that, before every phone call Lamell made, a warning advised him that the conversation would be recorded. Further, a DOC caseworker provided an orientation to the phone system. Thus, despite being on notice that his call would be recorded, Lamell chose to use the phone. Because use following actual notice constitutes implied consent, the Court concludes that Mr. Lamell impliedly consented to the recordings, and, therefore, the recordings did not violate the Act.

## 2. Fourth Amendment Objections

Lamell also argues that the recordings of his telephone conversations while in prison violated the Fourth Amendment. The Second Circuit has "squarely rejected this argument." United States v. Workman, 80 F.3d 688, 694 (2d Cir. 1996). Prisoners do not have a reasonable expectation of privacy in their calls from prison to non-attorneys. Amen, 831 F.2d at 379-80; see also Willoughby, 860 F.2d at 20. Accordingly, no Fourth Amendment violation occurred.

Lamell's Fourth Amendment argument does not end there, though. Relying on United States v. Cohen, Lamell additionally argues that the recordings violated the Fourth Amendment because they constituted a search initiated by non-prison officials for non-security reasons, and, thus, violated the Fourth Amendment. 796 F.2d 20 (2d Cir. 1986). In Cohen, an assistant United States Attorney ordered a corrections officer to search the defendant's cell for documents containing phone numbers of the defendant's accomplices to aid in the prosecution of the defendant. Id. at 21. Officers used evidence obtained during the search to secure a search warrant authorizing seizure of all documents belonging to the pre-trial detainee. Id. The Second Circuit reasoned that, because the search warrant was initiated by the prosecution rather than prison officials and because it was not conducted for reasons related to prison security, the search was not justified by Hudson v. Palmer, 468 U.S. 517 (1984) (concluding that the Fourth Amendment provides no protection for prisoners' claims of privacy in the prison cell). Because the court concluded that the search fell outside the scope of Hudson, the Second Circuit concluded that the evidence must be suppressed.

Cohen does not help Lamell. There is no evidence to suggest that Lamell was singled out; no evidence to suggest that the recordings were for something other than institutional security.

15

Accordingly, there is no Fourth Amendment violation similar to the one in Cohen.

### 3. First Amendment Objections

Lamell also objects to the recordings on First Amendment grounds. This Court notes at the outset that, while Lamell's phone calls were recorded, there is no evidence that his access to the phones was curtailed in any way. Defendant appears to argue that the recording itself violated the First Amendment. While prisoners do not forfeit all of their constitutional protections while incarcerated, "'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" Bell v. Wolfish, 441 U.S. 520, 545-46 (1979) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)). When a regulation infringes on a constitutional right, it must be "reasonably related to legitimate penological interests."[1] Turner v. Safley, 482 U.S. 78, 89 (1987). The Court is satisfied that recording inmates' telephone conversations furthers a legitimate interest in prison security, and does not impermissibly intrude on Lamell's First Amendment rights.

---

[1] While Turner dealt with correspondence between prisoners, the Turner test remains appropriate for communications between prisoners and non-prisoners. In Thornburgh v. Abbott, the Court noted that distinguishing between "incoming correspondence from prisoners . . . and incoming correspondence from nonprisoners would likely prove futile, and we do not invite it." 490 U.S. 401, 413 (1989).

16

**CONCLUSION**

For the reasons outlined above, Defendant's motion to suppress is **DENIED**.

Dated at Burlington, in the District of Vermont, this 25th day of October 2012.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge
